583 F.2d 1229
 Leroy McKNIGHT, Appellant,
v.
SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, James C.
McConnon, Francis P. Desmond, G. Roger Bowers, Philip R. T.
Caroll, Harold E. Kohn, Weldon B. Heyburn, Joseph L. Pyle,
Jr., Ellen Ann Roberts, Isadore M. Scott, Lawrence R.
Stoltz, Joseph Tracey, sued Individually and in their
official capacities as members of the Transportation Board
of the Southeastern Pennsylvania Transportation Authority,
William Eaton, Individually and in his official capacity as
General Manager of SEPTA, Robert Kind, Individually and in
his official capacity as Director of Security at SEPTA,
Frank X. Hutchinson, Individually and in his official
capacity as Director of Industrial Relations at SEPTA, Kevin
Duffy, Individually and in his official capacity as Manager
of Personnel at SEPTA.
 No. 77-2563.
 United States Court of Appeals,
Third Circuit.
 Argued July 24, 1978.
Decided Sept. 29, 1978.
 
 Carrie Menkel-Meadow, Penn Legal Assistance Office, Philadelphia, Pa., for appellant.
 David F. Girard-DiCarlo, Theodie L. Peterson, III, Thomas J. Bender, Jr., Dilworth, Paxson, Kalish, Levy & Kauffman, Philadelphia, Pa., for appellees the SEPTA defendants.
 Before ADAMS, WEIS and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 In modern society, the state has come to play an increasingly pervasive role in peoples' lives, and citizens have become ever more dependent on the government for the fulfillment of basic needs, such as of jobs. This development has focussed heightened attention on the requirement that the government should act, with respect to individuals whose interests are affected by its conduct, in a non-arbitrary, procedurally fair manner, according to the dictates of due process.
 
 
 2
 In this case, we are called upon to analyze the contours of the right to due process of one who has been discharged from public employment. Specifically, Leroy McKnight contends that he was denied such constitutional right when in the absence of a hearing or an opportunity to be heard he was terminated from employment with the Southeastern Pennsylvania Transportation Authority (SEPTA), on the grounds that he had been intoxicated and had not fulfilled his work- related responsibilities. The district court granted defendants' motion to dismiss McKnight's complaint. For the reasons set forth herein, we vacate the judgment of the district court and remand.
 
 I.
 
 3
 The complaint alleges that McKnight was employed from September 17, 1970, until November 22, 1975, as a special investigator in SEPTA's security force. SEPTA is an instrumentality of the Commonwealth of Pennsylvania operating under the Metropolitan Authorities Act of 1963, (66 P.S.A. § 2001 Et seq. (Purdon's Supp.1978)) (the Act), for the purpose of providing public transportation to the residents of the greater Philadelphia area. SEPTA's security force was not represented by a union, and its relationship with the employer was not governed by a collective bargaining agreement. However, § 25(a) of the Act (66 P.S.A. § 2025(a)) provides that no employee of an agency such as SEPTA may be discharged except for "just cause."
 
 
 4
 On November 22, 1975, SEPTA's Director of Security discharged McKnight "on the alleged grounds that he (McKnight) had been intoxicated while at work and that he had failed to perform his designated duties." McKnight denied the validity of the allegations. He also offered to undergo a test for sobriety, but his employers refused the offer. The employers did not allow McKnight to discuss the discharge with his immediate supervisor. Furthermore, McKnight was not given a written statement of the reasons for his discharge, and was provided with no opportunity to contest the charges that led to his dismissal. See McKnight v. SEPTA, 438 F.Supp. 813, 815 (E.D.Pa.1977).[1]
 
 
 5
 McKnight brought the present action on September 30, 1976, against SEPTA, eleven individuals who comprise SEPTA's Transportation Board and other officials of SEPTA, including its General Manager and Chief Executive Officer, Director of Industrial Relations and Director of Security. Jurisdiction of the federal court was asserted under 28 U.S.C. § 1343(3), and under the grant of general federal question jurisdiction conferred by 28 U.S.C. § 1331.
 
 
 6
 Defendants are charged in the complaint with denying the rights of McKnight to procedural and substantive due process. The complaint also asserts pendent state claims against the defendants for violating § 25 of the Act, Supra, and for breaching McKnight's employment contract.
 
 
 7
 As a result of his discharge, the complaint declares, McKnight suffered a deprivation of "income, economic hardship and emotional distress," as well as a loss of accumulated vacation pay and retirement benefits. Also, it is said that he sustained a "loss of reputation in the community and the loss of opportunity for other employment." For relief, McKnight seeks compensatory damages and costs; a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, stating that SEPTA's practices are unconstitutional; and an order compelling a hearing, reinstating him to his former position, and granting him accumulated backpay, vacation and retirement benefits.
 
 
 8
 Defendants moved jointly to dismiss the action for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. See Fed.R.Civ.P. 12(b)(1) and (6).
 
 
 9
 In a carefully crafted opinion filed on October 4, 1977, the district court held that SEPTA was excluded from liability under the Civil Rights Act of 1871 because that Act imposes liability only upon "persons," and "it is now firmly established that a state governmental entity such as SEPTA is not a 'person' within the meaning of the Act." McKnight v. SEPTA, 438 F.Supp. at 816. Inasmuch as SEPTA is excluded from the reach of the Act, the district court reasoned, jurisdiction over the claims lodged against SEPTA could not be predicated on 28 U.S.C. § 1343(3), for the latter statute is operative only as the jurisdictional vehicle for claims satisfying the Act's requirements.
 
 
 10
 With respect to McKnight's argument that the district court has federal question jurisdiction over the action pursuant to 28 U.S.C. § 1331, the trial court concluded that such jurisdiction extends only to the prayers for declaratory and injunctive relief against SEPTA. The claim for damages, it ascertained, was barred by the principle that "an action for damages against a state governmental entity may not be asserted directly under the Fourteenth Amendment." 438 F.Supp. at 816; See also Jones v. McElroy, 429 F.Supp. 848, 853-60 (E.D.Pa.1977).[2]
 
 
 11
 Upon reaching the merits, the district court determined that the question whether McKnight had been deprived without due process of a "property" interest which depends on there being an independently-created property right of which McKnight had been stripped was "sufficiently unclear (so as) to warrant abstention." In declining to deal with the question of McKnight's property-based claim to due process, the district court left its resolution to the state courts.[3]
 
 
 12
 The district court then discussed McKnight's contention that he had suffered grave detriment to his reputation and his future employment prospects and thus to a protected "liberty" interest as a consequence of his discharge on the grounds of intoxication. The court ruled that defendant's accusation regarding McKnight's intoxication was "not sufficiently stigmatizing" of him to rise to the level of an abridgement of his "liberty" interest, and thus could not act to trigger due process safeguards.[4]
 
 
 13
 After thus disposing of the constitutional issues, the district court exercised its discretion and dismissed the pendent state law claims.
 
 II.
 A.
 
 14
 We turn first to the district court's analysis of the scope of federal jurisdiction over the present action.
 
 
 15
 In concluding that an action under § 1983 may not be maintained against SEPTA, for "a state governmental entity such as SEPTA is not a 'person' within the meaning of the (Civil Rights) Act," the district court relied on a line of Supreme Court cases reaching back to Monroe v. Pape, 365 U.S. 167, 187-92, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). See also City of Kenosha v. Bruno, 412 U.S. 507, 511-13, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); Moor v. County of Alameda, 411 U.S. 693, 706-10, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). The theory of Monroe, with respect to the point in question, is that Congress did not intend to bring municipal corporations within the ambit of the Act. See 365 U.S. at 187-92, 81 S.Ct. 473.
 
 
 16
 However, the Supreme Court recently re-analyzed the relevant legislative history and came to the opposite conclusion regarding the liability of local governments. It specifically overruled Monroe v. Pape "insofar as it holds that local governments are wholly immune from suit under § 1983." Monnell v. Department of Social Services of the City of New York, 436 U.S. 658, 659, 98 S.Ct. 2018, 2019, 56 L.Ed.2d 611 (1978).
 
 
 17
 Monnell set forth the following interpretation of the reach of § 1983:
 
 
 18
 Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress Did intend municipalities and other local government units to be included among those persons to whom § 1983 applies. Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels.[5] (emphasis in original)
 
 
 19
 Thus, to the extent that the district court relied on the Supreme Court's articulation of the law prior to Monnell, its analysis may no longer be sustained. We must accordingly mandate further consideration, in light of Monnell, of McKnight's claim for damages under § 1983.[6]
 
 B.
 
 20
 The history of the phrase "due process of the law" extends at least from the time of Magna Carta, for in the century following the promulgation of that document in 1215, those words became the official English translation conveyed in reissues of the charter of the original Per legem terrae, "by the law of the land."[7] Reference to due process came to be viewed as a basic protection against arbitrariness in government.[8]
 
 
 21
 Similarly, in modern American constitutional law, the guarantee of due process has been seen to represent " . . . a profound attitude of fairness between . . . the individual and government . . . " Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 162, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).[9] As such, due process is not susceptible to easy or exact definition. Indeed, as Justice Frankfurter put it, "(e) xpressing as it does in its ultimate analysis respect enforced by law for that feeling of just treatment which has been evolved through centuries of Anglo-American constitutional history and civilization, 'due process' cannot be imprisoned within the treacherous limits of any formula . . . Due process is not a mechanical instrument. . . . It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process." Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. at 162-63, 71 S.Ct. at 644.
 
 
 22
 Perhaps because of its very capaciousness, the notion of due process has been expressed in a number of different doctrinal formulations.[10] Since Board of Regents v. Roth, 408 U.S. 564, 569-72, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the requirement of due process has been said to arise so long as an individual has suffered a deprivation of protected "liberty" or "property" interests, which themselves have been deemed to depend on the existence of an independently-grounded right. Cf. Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); Goss v. Lopez, 419 U.S. 565, 572-73, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); Perry v. Sindermann, 408 U.S. 593, 599, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Accordingly, we shall focus our inquiry on whether McKnight has set forth allegations in his complaint of a deprivation of a protected "liberty" or "property" interest that are sufficient to survive defendants' motion to dismiss.
 
 1. The "Liberty" Interest
 
 23
 The scope of protected "liberty" as a component of the due process clause of the Fourteenth Amendment is "(i)n a Constitution for a free people . . . broad indeed." Roth, 408 U.S. at 572, 92 S.Ct. at 2707. The Supreme Court in Roth, id. quoted with approval the language of Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), which underscored the breadth of the protection of "liberty":
 
 
 24
 While this (C)ourt has not attempted to define with exactness the liberty . . . guaranteed (by the Fourteenth Amendment), the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.
 
 
 25
 Any such enumeration of the interests conceived to be within the ambit of the "liberty" interest by its very nature is not exhaustive. Indeed, Roth Stressed that, in addition to those interests named in Meyer, courts must safeguard individuals against harm to their " 'good name, reputation, honor, or integrity . . . ' " Id. 408 U.S. at 573, 92 S.Ct. at 2707. For "(w)here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971).[11] The "liberty" interest arising from a person's stake in his reputation is what McKnight argues has been infringed here.
 
 
 26
 McKnight's complaint avers that defendants accused him of being intoxicated at work,[12] and that "(a)s a result of defendants' communication to others of SEPTA's discharge of plaintiff and other unsubstantiated charges against plaintiff, he has suffered loss of reputation in the community and the loss of opportunity for other employment."[13] Such allegations must be taken as true for the purpose of determining whether it is proper to grant a motion to dismiss, See Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 172, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), and they must be construed in the light most favorable to McKnight, See, e. g., Helstoski v. Goldstein, 552 F.2d 564, 565 (3d Cir. 1977). The complaint may not be dismissed unless "it appears beyond doubt" that McKnight can establish "no set of facts in support of his claim" that would give rise to an entitlement for relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).
 
 
 27
 In holding that the allegations in the complaint were not sufficient to withstand a motion to dismiss, the district court did not rest its conclusion on inadequate or unclear pleading. Indeed, it specifically granted that any such deficiency "could be cured by amendment." (438 F.Supp. at 824.) Rather, the district court declared that the "fatal flaw" in McKnight's position regarding his putative "liberty" interest is that "the accusation about which he complains is not sufficiently stigmatizing." Id. As the trial court wrote:
 
 
 28
 (T)he charge that plaintiff "had been intoxicated while at work" referred to an isolated incident and therefore . . . is not of a stigmatizing character. A charge of intoxication does not reflect "dishonesty," or "immorality" or any similar "serious character defects" . . . . Intoxication is not illegal. As defendants point out, there was no general charge of alcoholism, such as would seriously reflect on an individual's ability to perform adequately in an employment situation. At most, an isolated incident of intoxication reflects intemperance and unsatisfactory job performance . . . .[14]
 
 
 29
 On appeal, McKnight maintains, first, that the assertion by the district court that the charge of his intoxication is not so stigmatizing as to amount to a deprivation of "liberty" constitutes a premature finding of fact entered before the evidence has been presented and thus, at this stage, is wholly insupportable. Second, McKnight urges that other requirements for stating a claim for relief from injury to one's "liberty" interest have been met in this case. Third, McKnight insists that his argument based on his "liberty" interest is buttressed by the fact that the Pennsylvania Constitution includes clauses specifically protecting a citizen's reputation. Such clauses, says the plaintiff, bring this case squarely within the class of situations involving an explicit, state-protected "liberty" interest.
 
 
 30
 We find persuasive McKnight's contention that the issue whether defendants' charge of intoxication is sufficiently stigmatizing to constitute an infringement of "liberty" is significantly a question of fact that cannot be appropriately determined at this juncture.
 
 
 31
 One basic element of the "liberty" interest recognized by the Supreme Court is the protection against interference in the absence of due process with an individual's " . . . later opportunities for . . . employment". Goss v. Lopez, 419 U.S. 565, 575, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). In the complaint here, the "loss of opportunity for other employment" is specifically cited as a detriment flowing from the defendants' action. Thus, the question arises whether the defendants' charge of McKnight's intoxication in fact has been so stigmatizing as to hinder McKnight in seeking other opportunities of employment. Simply by reading the complaint, it cannot be said with certainty whether such effects did or did not flow from defendants' conduct. Because a motion to dismiss should not be granted unless it appears "beyond doubt" that there are no facts that would entitle plaintiff to relief,[15] and since allegations of substantial stigma are clearly set forth in the complaint, it would appear incorrect to assume in the absence of any evidence that sufficient stigma cannot be shown.[16]
 
 
 32
 In response, defendants submit that allegations of harm to reputation resulting from discharge from public employment should be divided into two broad categories: those that involve charges pertaining to the employee's performance on the job itself, and those that ascribe to the employee some broad "status" beyond that necessarily entailed in the job. The idea underlying this suggestion is that only statements of the second sort rise to the level of a deprivation of a person's "liberty." Because the charges against McKnight fall into the first classification, defendants urge, they cannot be said to be so stigmatizing as to abridge McKnight's "liberty."
 
 
 33
 Looked at critically, defendants' argument depends on the possibility of drawing a bright-line distinction between charges about an employee that impute to him inappropriate or wrongful behavior in a discrete context on the job, and statements about an employee that impute to him a general social status that is opprobrious and that transcends a given job. Yet such a would-be distinction is slippery at best.
 
 
 34
 Of course, defendants concede and we agree that if an employer discharges an employee for being an "alcoholic" or a "thief," that employer may be said, because of the ordinary meaning of the words "alcoholic" and "thief," to have attributed to the employee a "status" of a general nature. Yet a problem arises when the employer's statement is not of the sort that ascribes a status to an employee, but rather is the type present here that accuses the employee of a particularized act, such as that of intoxication. Such a charge does not facially attribute an opprobrious status to an employee. However, that does not rule out the possibility that, for at least some people, a charge of "intoxication" would amount to an accusation that the employee is "a drinker."
 
 
 35
 To put the point in another context, an employer might discharge an employee for stealing pencils. Many people might say that the action that was the ground for discharge was discrete and confined to a certain job. However, other people could plausibly argue that the accusation really cited the employee for being "a thief" of pencils or in other words, that it charged the employee with a status transcending the employee's particular job. Indeed, it is hardly difficult to imagine that prospective employers would see very little practical difference between an assertion by an applicant's previous employer that he had stolen pencils, and a flat denunciation of him as a pencil thief. Such analysis indicates that the defendants' suggestion to base the legal determination of whether an employee's "liberty" interest in reputation has been infringed on such an elusive distinction as that between "particular charges" and "status charges" is unacceptable.
 
 
 36
 The alternative to the defendants' suggestion of categorizing different situations is, inevitably, to focus on the particular facts of a specific case in ascertaining whether the cited harm to reputation and employment prospects has actually resulted from the employer's charge. Such concentration on the facts of the case at hand is reflected clearly in Supreme Court decisions dealing with claims of a deprivation of "liberty" flowing from discharge from employment. Thus, in Board of Regents v. Roth, the Court in reviewing a grant of summary judgment wrote:
 
 
 37
 The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. . . .[17]
 
 
 38
 Hence, on the record before us, all that clearly appears is that the respondent was not rehired for one year at one university. It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another.[18]
 
 
 39
 Similarly, the Court in Bishop v. Wood, supra once more reviewing a grant of summary judgment again closely analyzed the particular facts in determining whether an employee was sufficiently stigmatized as a result of his dismissal to give substance to his claim of a deprivation of "liberty". The Court stressed that the asserted reasons for the employer's decision "were communicated orally to the petitioner in private" and that the "communication was not made public."[19] Therefore, on the basis of the specific facts of the case, Bishop concluded that the plaintiff's "liberty" interest had not been abridged.
 
 
 40
 In short, defendants have simply not provided an adequate answer to the question implicitly posed by McKnight of how a court is to know whether an employee has been so stigmatized by the employer's accusations against him as to have been precluded from other employment opportunities unless the court is exposed to pertinent evidence. Such evidence could relate, for instance, to the employee's applications for employment; the results of any such applications; the reasons given, if any, for his lack of success in securing other employment; and the practices among employers toward hiring security guards who have been discharged for intoxication. But defendants rely primarily on the district court's language to the effect that the charge of intoxication cannot be considered stigmatizing in modern society. The point still remains that McKnight has alleged that In his case not in society generally the charges against him foreclosed him from future employment opportunities by harming his reputation. It would appear unresponsive to assert A priori even assuming that the assertion is correct that overall such a result does not obtain.
 
 
 41
 Consequently, we determine that it was incorrect to say in the absence of clear evidence that McKnight has not set forth adequate allegations of harm to his reputation constituting a deprivation of "liberty."[20]
 
 
 42
 This conclusion does not end discussion of McKnight's "liberty" interest, however, for defendants suggest that there are reasons other than the one cited by the district court for affirming the grant of their motion to dismiss. Thus, defendants declare that McKnight has run afoul of the principle of Codd v. Velger, 429 U.S. 624, 627-28, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977), that the individual claiming he has been denied due process should have actually challenged the charge made about him by the party said to have infringed his rights.[21] Defendants assert, in particular, that the paragraph of the complaint stating that the "allegations made by SEPTA officials were untrue"[22] does not constitute such a direct challenge.
 
 
 43
 We do not agree. The complaint makes it clear that McKnight denied the charge of intoxication, as well as any other accusations that were made about him. But even granting Arguendo that there is ambiguity in the wording of the complaint, we cannot say that the pleading transgresses the admonition in Codd, for there the Supreme Court wrote that "(n)owhere in his pleading Or elsewhere has respondent affirmatively asserted that the report (about him) . . . was substantially false" (emphasis added). 429 U.S. at 627, 97 S.Ct. at 884. In contrast, McKnight has not failed totally to deny the charges about him.[23]
 
 
 44
 Defendants contend further that the complaint does not adequately assert that there has been public disclosure of the charges relating to McKnight. They concede that the complaint set forth that there was "communication to others" of the discharge. But defendants characterize that averment as insufficient on the grounds that it does not explicitly allege "public disclosure," and it does not set forth the nature of the facts disclosed.
 
 
 45
 In our view, although there may be some ambiguity in the pleadings, that alone is not an adequate basis for a dismissal, especially since, as the trial court pointed out, any such deficiencies could have been corrected by amendment. Also, the complaint asserts that there was "communication to others" of the discharge, and it avows that this led to "loss of reputation in the community and the loss of opportunity for other employment." That is enough to preserve the issue, at least at this stage of the proceedings.[24]
 
 
 46
 Paul v. Davis expressed a concern that we not unduly unsettle the relationship between the national and state governments by overly broadening the scope of federally protected "liberty" interest.[25] That consideration would not appear to be present here. Article I § 1 of the Pennsylvania Constitution, which deals with the "inherent rights of mankind," provides:
 
 
 47
 All men are born equally free and independent, and have Certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and Protecting property and Reputation, and of pursuing their own happiness.[26] (emphasis added)
 
 
 48
 Since the state has already asserted its policy of protecting the right of reputation, the federally-based cause of action would be consistent, rather than contrary to, the state approach.
 
 
 49
 In sum, we hold that the order granting defendants' motion to dismiss insofar as the argument regarding the "liberty" interest is concerned should be vacated.
 
 2. The "Property" Interest
 
 50
 As the Supreme Court has written with regard to "property" interests in general, to have such an interest one must have "more than a unilateral expectation" or "an abstract need or desire" for it. Rather, one must have "a legitimate claim of entitlement to it." Such claims are "created and their dimensions are defined by existing rules or understandings that stem from an independent source Such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Board of Regents v. Roth, 408 U.S. at 577, 92 S.Ct. at 2709 (emphasis added); See also Bishop v. Wood, 426 U.S. at 344 & n. 7, 96 S.Ct. at 2709.[27]
 
 
 51
 The particular state statute that McKnight cites as the foundation of the "property" interest at stake in the present case is § 25(a) of the Act, 66 P.S.A. § 2025(a) (Purdon's Supp.1978). Section 25 deals, Inter alia, with the classification of employees and their discharge, and subsection (a) provides:
 
 
 52
 The board shall classify all the offices, positions and grades of regular employment required, excepting that of the chairman of the board, . . . with reference to the duties thereof and the compensation fixed therefor and adopt rules governing appointments to any of such offices or positions on the basis of merit and efficiency. No discrimination shall be made in any appointment or promotion because of race, creed, color or political or religious affiliations. No officer or employee shall be discharged or demoted except for just cause. (emphasis added)
 
 
 53
 McKnight's position is that the "just cause" provision in the statute creates a protected "property" interest, for in mandating that an employee like McKnight shall not be discharged unless such action is supported by "just cause," the provision conditions the ability of the government to terminate his employment. The district court declined to reach this issue, holding instead that the meaning of the statute was sufficiently unclear so that abstention was warranted in order to give the state courts an opportunity to address the matter.
 
 
 54
 Among the limited situations in which the Supreme Court has recognized abstention to be proper are those instances where a federal constitutional claim is premised on an unsettled question of state law whose determination by the state court might avoid or modify the constitutional issue. Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).[28] Abstention under such circumstances generally serves the dual purposes of averting unnecessary adjudication of constitutional issues and precluding needless interference with legitimate and sensitive state programs.[29]
 
 
 55
 Abstention, however, inevitably gives rise to a number of adverse consequences. Relegating the parties to the state courts often results in undue delay in the resolution of the controversy and greatly increases the costs of litigation, factors that heighten the danger that valuable federal rights might be lost.[30] Not surprisingly, the Supreme Court has consistently instructed that abstention
 
 
 56
 . . . is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest.
 
 
 57
 County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188-189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959), Quoted in Colorado River Water Conservation District v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).
 
 
 58
 Mindful of the Supreme Court's admonition that a federal court should abstain only when "special circumstances"[31] exist, we are not convinced that the federal courts must abstain from deciding McKnight's "property" claim. We assume without deciding that § 25(a) of the Act and the relevant case law precedents are sufficiently unclear to justify resort to the Pullman doctrine,[32] and note that a clarifying pronouncement by the state courts to the effect that § 25(a) does not create a property interest would obviate a constitutional adjudication. Nonetheless, it appears that abstention in this case would not "clearly serve an important countervailing interest."[33]
 
 
 59
 On the one hand, if the district court upon being confronted with the issue would conclude that § 25(a) does not establish a property right, it would not have to decide the federal constitutional issue and would not interfere at all with the state's settled practice for dismissing employees. In that event, then, neither of the purposes that generally warrant abstention would be furthered.
 
 
 60
 If on the other hand, the lower court were it directed to decide McKnight's claim would conclude that indeed the statute conferred a property right upon McKnight, it would have to reach the constitutional issue. But the question whether summary dismissal of an employee who has a property interest in not being dismissed "except for just cause" violates due process would not appear to be a difficult or novel one. Rather, it involves the application of settled principles to a clear fact pattern. Furthermore, such a determination would not upset sensitive state programs. The state would still be free to dismiss its employees; it would only have to afford them notice and an opportunity to be heard to the limited extent mandated by due process.[34] Should it find even these procedures to be too burdensome, the state through its legislature or courts would be free to amend or construe the statute and make explicit its intent that the employees not be invested with a property right. Since the court would be applying an established constitutional principle and would not be jeopardizing the implementation of state policies or restricting state prerogatives, abstention from a determination that § 25(a) of the Act establishes a property interest does not appear to be compelled by the values that justify abstention.[35]
 
 
 61
 Thus, neither of the alternative constructions of § 25(a) by a federal court would substantially implicate the concerns manifested in the Pullman abstention doctrine. Indeed, in view of the fact that McKnight's "liberty" claim is being remanded to the district court, were that court now to abstain from reviewing McKnight's "property" claim, McKnight would be placed in the cumbersome position of having to litigate concurrently in two forums issues pertaining to the same congeries of facts. The economic burden that would be placed upon McKnight and the inevitable delay in vindicating his constitutionally guaranteed rights, as well as the unnecessary duplication of federal and state judicial efforts, render such an approach unwise.
 
 
 62
 Although had we been faced with the abstention problem in the first instance, the foregoing considerations would have shaped our decision, we are unprepared at least at this time to declare that the district court has abused its discretion in choosing to abstain.[36] Nevertheless, in view of the fact that remand is necessitated by the disposition we have reached regarding McKnight's "liberty" interest, we suggest that the district court consider the question of McKnight's "property" interest as well.
 
 III.
 
 63
 The judgment of the district court will be vacated, and the case remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 [1]
 McKnight asserts also that, in subsequent unemployment compensation proceedings, SEPTA officials arbitrarily altered their explanation of the justification for the discharge because of their inability to prove his intoxication
 
 
 [2]
 The district court noted in this regard that recently this Court has declined to decide the issue of municipal liability directly under the Fourteenth Amendment, See Gagliardi v. Fling, 564 F.2d 112, 116 (3d Cir. 1977), and Mahone v. Waddle, 564 F.2d 1019, 1024 (3d Cir. 1977), and that until there is a "definitive ruling" by this Court on the subject, it would adhere to the view expressed in Jones, 429 F.Supp. 848 (E.D.Pa.1977). See 438 F.Supp. at 817
 
 
 [3]
 See 438 F.Supp. at 822, and 823, where the district court wrote:
 In my view, however, given the lack of state law clarity and the importance and sensitive nature of the state policies implicated in this case, the considerations of federalism underlying the Pullman abstention doctrine outweigh whatever inconvenience plaintiff may suffer. I therefore shall adhere to the decision . . . that whether a SEPTA employee has a property interest in his job is an unsettled question of state law which initially should be decided by the Pennsylvania courts.
 
 
 [4]
 The district court also rejected McKnight's contention that he was denied a right to substantive due process, saying that it "must be linked to his alleged property interest in employment or liberty interest in reputation." Also, the district court said that "the substantive due process claim appears to be a disguised duplicate of plaintiff's pendent state claim under the Metropolitan Transportation Authorities Act . . . " 438 F.Supp. at 827. Because of our resolution of the issues pertaining to McKnight's claim for procedural due process, we do not consider it necessary to treat separately his argument regarding substantive due process. The latter is, as the district court noted, closely linked with McKnight's position relating to his "liberty" and "property" interests
 
 
 [5]
 436 U.S. at 690, 98 S.Ct. at 2036. The Court's interpretation of the scope of § 1983 was further clarified in these terms, Id.:
 . . . the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable Solely because it employs a tortfeasor or, in other words, a municipality cannot be held liable under § 1983 on a Respondeat superior theory. (emphasis in original)
 
 
 [6]
 Having vacated that portion of the district court's order dealing with the reach of § 1983, we consider that it is not necessary to address the additional question whether SEPTA may be liable for damages directly under the Fourteenth Amendment. That matter should be dealt with in an appropriate case. However, just as the district court assumed that at least declaratory and injunctive relief can be obtained in this case, so shall we, and thus we proceed to the merits
 
 
 [7]
 See Pennock, Introduction, NOMOS XVIII: Due Process xv (J. Pennock & J. Chapman, eds., 1977). See also Miller, The Forest of Due Process of Law, id. at 5. ("(I)n the 1354 reissue of the charter under Edward III, Magna Carta appears officially in English for the first time. In Chapter 29, in place of Per legem terrae, are the words "by due process of the law.")
 
 
 [8]
 See Miller, Supra note 7
 
 
 [9]
 See also Hurtado v. California, 110 U.S. 516, 535, 4 S.Ct. 111, 120, 28 L.Ed. 232 (1884) (due process protects "those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions")
 
 
 [10]
 See, e. g., Kadish, Methodology and Criteria in Due Process Adjudication a Survey and Criticism, 66 Yale L.J. 319 (1957); Grant, The Natural Law Background of Due Process 31 Colum.L.Rev. 56 (1931); Corwin, The Doctrine of Due Process of Law Before the Civil War, 24 Harv.L.Rev. 366 (1911). The modern evolution of the doctrine of due process is comprehensively outlined and analyzed in Professor Tribe's recent treatise, American Constitutional Law 501-39 (1978)
 
 
 [11]
 See also Wieman v. Updegraff, 344 U.S. 183, 191, 73 S.Ct. 215, 97 L.Ed. 216 (1952); United States v. Lovett, 328 U.S. 303, 316-17, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946); Peters v. Hobby, 349 U.S. 331, 352, 75 S.Ct. 790, 99 L.Ed.2d 1129 (1955) (Douglas, J., concurring). The position of Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), was qualified in Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405 (1976), where the Supreme Court wrote that the line of cases dealing with the "liberty" interest in reputation "does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." For a discussion of Paul 's narrowing of the scope of interests protected by due process, See Tribe, American Constitutional Law 527-29 (1978)
 
 
 [12]
 See P 14 of complaint
 
 
 [13]
 P 22 of complaint
 
 
 [14]
 438 F.Supp. at 824
 
 
 [15]
 See Conley v. Gibson, 355 U.S. 41, 45-56, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)
 
 
 [16]
 Cf. McGhee v. Draper, 564 F.2d 902, 909-10 (10th Cir. 1977) (reversing a directed verdict on the issue whether sufficiently stigmatizing accusations had been circulated by defendants); Austin v. Board of Education of Georgetown, 562 F.2d 446, 450 (7th Cir. 1977) (reversing a grant of summary judgment against a plaintiff who alleged a deprivation of liberty due to the disclosure of stigmatizing charges)
 
 
 [17]
 408 U.S. at 573, 92 S.Ct. at 2707
 
 
 [18]
 Id. at 575, 92 S.Ct. at 2708
 
 
 [19]
 426 U.S. at 348, 96 S.Ct. at 2079
 
 
 [20]
 Because of our conclusion in this regard, there is no occasion to discuss McKnight's alternative argument that as a matter of law the allegations of harm to his reputation are sufficient to make out a claim of a deprivation of "liberty"
 
 
 [21]
 The Court wrote in Codd, 429 U.S. at 627, 97 S.Ct. at 884:
 (I)f the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee . . . Nowhere in his pleadings or elsewhere has respondent affirmatively asserted that the report . . . was substantially false. Neither the District Court nor the Court of Appeals made any such finding. When we consider the nature of the interest sought to be protected, We believe the absence of any such allegation or finding is fatal to Respondent's claim under the Due Process Clause . . . (emphasis added).
 
 
 [22]
 Complaint P 16
 
 
 [23]
 The disparity between the present situation and that in Codd v. Velger is highlighted by the following remarks in Codd, 429 U.S. at 628, 97 S.Ct. at 884, pertaining to the limits of its holding:
 Our decision here rests upon no overly technical application of the rules of pleading. Even conceding that the respondent's termination occurred solely because of the report of an apparent suicide attempt, a proposition which is certainly not crystal clear on this record, respondent has at no stage of this litigation affirmatively stated that the 'attempt' did not take place as reported. The furthest he has gone is a suggestion by his counsel that '(i)t might have been all a mistake, (i)t could also have been a little horseplay.' This is not enough to raise an issue about the substantial accuracy of the report.
 In the present case, by contrast, there is no similar absence of any statements by McKnight that "raise an issue about the substantial accuracy" of the charges relating to him. See also 429 U.S. at 629 (Brennan, J., dissenting), 631 (Stevens, J., dissenting), 97 S.Ct. 882, 884.
 
 
 [24]
 In addition, defendants' reliance on Bishop v. Wood, 426 U.S. at 348-49, 96 S.Ct. 2074, is misplaced. For in Bishop, the Supreme Court was able to say with confidence that the reasons for the challenged discharge from employment were not made public. Any similar comment could be made in this case only after further factual development
 
 
 [25]
 424 U.S. at 711-12, 96 S.Ct. at 1165 ("Kentucky law (at issue in Paul ) does not extend to respondent any legal guarantee of present enjoyment of reputation which has been altered as a result of petitioners' actions" of the officials)
 
 
 [26]
 And Article I, § 11 of the Pennsylvania Constitution provides:
 All courts shall be open; and Every man for an injury done him in his lands, goods, person Or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. (emphasis added).
 
 
 [27]
 The conception that a "property" interest arises only when one has been deprived of an independently-grounded, state-created entitlement has been criticized by some commentators as reflecting too narrow and inflexible a view of the interests protected by the principle of due process. See, e. g., Monaghan, Of "Liberty" and "Property", 62 Cornell L.Rev. 405 (1977); Tribe, Structural Due Process, 10 Harv.Civ.Rts.-Civ.Lib.L.Rev. 269, 275-83 (1975); Note, The Supreme Court, 1975 Term, 90 Harv.L.Rev. 56, 86-104 (1976); Comment, Entitlement, Enjoyment and Due Process of Law, 1974 Duke L.J. 89. See also Comment, Two Views of a Prisoner's Right to Due Process: Meachum v. Fano, 12 Harv.Civ.Rts.-Civ.Lib.L.Rev. 405 (1977)
 
 
 [28]
 See also Bellotti v. Baird, 428 U.S. 132, 146-47, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); Colorado River Water Cons. Dist. v. United States, 424 U.S. 800, 813-15, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); Harris County Comm'rs Court v. Moore, 420 U.S. 77, 82-84, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975); Lake Carriers' Assn. v. MacMullen, 406 U.S. 498, 509-10, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). See generally, P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and The Federal System, 985-97 (2d ed. 1973); G. Gunther, Constitutional Law 1606-09 (9th ed. 1975); C. Wright, Law of Federal Courts, 218-29 (3d ed. 1976); 17 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4242 (1978); Field, The Abstention Doctrine Today, 125 U.Pa.L.Rev. 590 (1977); Field, Abstention in Constitutional Cases: The Scope of the Pullman Abstention Doctrine, 122 U.Pa.L.Rev. 1071 (1974)
 
 
 [29]
 Field, Abstention in Constitutional Cases, supra note 28, at 1093-1101
 
 
 [30]
 E. g. Harris County Comm'rs Court v. Moore, 420 U.S. 77, 83, 95 S.Ct. 870, 43 L.Ed.2d 32 (1976); Lake Carriers' Assn. v. MacMullen, 406 U.S. 498, 509, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972)
 
 
 [31]
 Harris County Comm'rs Court v. Moore, 420 U.S. 77, 83, 95 S.Ct. 870, 43 L.Ed.2d 32 (1976), Quoting Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967)
 
 
 [32]
 See C. Wright, A. Miller & E. Cooper, Supra note 28, at 455-56 ("There would be no point in sending the parties to state court to find out what the state law is, and thus possibly avoid having to decide the federal constitutional question, if the state law is known"); Field, Abstention in Constitutional Cases, supra note 28, at 1090-93
 
 
 [33]
 County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188-89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959)
 
 
 [34]
 It is evident that due process does not require a full evidentiary hearing prior to every deprivation of property, but that rather, "due process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), Quoting Morrissey v. Brewer, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). See generally, Town Court Nursing Center v. Beal, 586 F.2d 280 at 287-294 (3d Cir. 1978) (Adams, J., concurring)
 
 
 [35]
 See Field, Abstention in Constitutional Cases, supra note 28, at 1128 (outlining an approach to abstention in cases that turn on construction of a state statute)
 
 
 [36]
 Since the abstention doctrine is by its nature discretionary, a lower court determination can be set aside only if it has abused its discretion. Frederick L. v. Thomas, 557 F.2d 373, 382 (3d Cir. 1977)