**ALTEMOSE CONSTRUCTION COMPANY, Plaintiff,**

v.

**ATLANTIC, CAPE MAY AND PARTS OF BURLINGTON, OCEAN AND CUMBERLAND COUNTIES BUILDING TRADES COUNCIL, et al., Defendants.**

**Civ. A. No. 79–2912.**

United States District Court,
D. New Jersey.

June 19, 1980.

Jeanne M. Schubert, Camden, N. J., Max L. Lieberman, Pelino & Lentz, Philadelphia, Pa., for plaintiff.

James E. Panny, April & Panny, Marmora, N. J., for defendant Lentine Sand and Gravel Co.

S. Kemble Salvo, Salvo & Salvo, Millville, N. J., for defendant Eastern Transit Mix, Inc.

Louis H. Wilderman, and Richard B. Sigmond, Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for defendants Teamsters and Chauffeurs Union, Local No. 331; Atlantic, Cape May, and Parts of Burlington, Ocean and Cumberland Counties Bldg. Trades Council; Glaziers Local Union 252; and United Union of Roofers, Waterproofers and Allied Workers, Locals 30 and 30 B, AFL–CIO.

## OPINION

BROTMAN, District Judge.

This is an action by a nonunion general contractor seeking compensatory and punitive damages against a labor association, four local unions and three concrete suppliers for antitrust violations, and against the labor organization defendants for violations of the federal labor laws. Jurisdiction is asserted under 15 U.S.C. §§ 1, 2 (Sherman Act), 4 and 16 (Clayton Act), 29 U.S.C. § 187 (Labor-Management Relations Act) and 28 U.S.C. § 1337 (Judicial Code). The case is presently before the court upon motion by the labor organization defendants for dismissal of the complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).

When a motion is made under rule 12(b)(6) it will be denied unless there are clearly no set of facts that can be proved which might entitle the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). All facts pleaded by the plaintiff must be taken as true and all reasonable inferences must be drawn in favor of the plaintiff. *McKnight v. Southeastern Pennsylvania Transportation Authority*, 583 F.2d 1229, 1235–36 (3rd Cir. 1978). The complaint will not be dismissed unless some insuperable bar to relief is apparent on the face of the complaint, *Battle v. Liberty National Life Insurance Company*, 493 F.2d 39, 44 (5th Cir. 1974), and this rule applies with no less force to a Sherman Act claim. *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 245, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980).

## I. Plaintiff's Allegations

(The following narrative is derived solely from the complaint.)

Plaintiff Altemose Construction Company is a general construction contractor engaged in interstate commerce with its principal place of business located in Center Square, Pennsylvania. In June of 1979 Altemose entered into a contract with Tilton Racquetball Associates (Tilton), to build for it a racquetball facility in Pleasantville, New Jersey. The base price of the contract was $700,000. The contract also provided that time was of the essence and that Alte-

mose could be subject to late penalties, termination and damages if undue delay occurred.

On July 28, 1979 several agents of the defendants went to the home of Tilton's construction consultant for the project in the belief that he was the principal. The consultant, Samuel Young, informed those individuals that he was not the principal, to which they replied that they wished to meet with the owner to discuss removal of Altemose, a nonunion contractor, from the project. They threatened that they would take all possible action to ensure that the project would not be completed unless Altemose were removed.

As a result of that meeting, a second meeting was held on July 30, 1979 in Atlantic City. In attendance were the general partners of Tilton, the president of defendant building trades council[1] (Trades Council), the business manager of the Glaziers local union, a business representative of the Roofers local union, a member of the Roofers local and the attorney for all of the labor organization defendants. The agents of the labor union defendants threatened to picket and delay or prevent construction of the racquetball facility unless Altemose were removed as general contractor. The stated reasons for the threats were their beliefs that Altemose was testing whether it could build "nonunion" in Atlantic County, New Jersey and their desire to prevent Altemose from acquiring lucrative contracts to build hotels and casinos in Atlantic City, New Jersey. At least one of the labor people claimed that he could negotiate a replacement union contractor who would work for the same amount as the Altemose contract. Complaint, at ¶ 24.

In late July or early August 1979 Altemose contracted with defendant Silvi Concrete Products, Inc. (Silvi) for the purchase and delivery of "ready mix" concrete to the construction site. Ready mix concrete is essential to the construction of most buildings.[2] In southern New Jersey, concrete—including that sold by defendants Silvi, Eastern Transit Mix, Inc. (Eastern) and Lentine Sand and Gravel Company (Lentine)—is sold per "yard" and the price includes batching and delivery, even if the contractor does not use the delivery services of the supplier. Complaint, at ¶ 16.

On August 8, 1979 defendant Silvi recognized defendant Teamsters as exclusive bargaining representative for some of its employees and subsequently informed Altemose that it would not continue to perform its obligations under the contract with Altemose. The plaintiff then entered into a similar arrangement with defendant Lentine under which Lentine would batch, sell and deliver concrete to the project site.

Fifteen to eighteen pickets went to the job site on August 9, 1979 on behalf of the labor union defendants and carried signs claiming that Altemose provided substandard wages and working conditions. Law enforcement officers were present, but when two Altemose employees attempted to enter the work area, the pickets insulted them and Altemose and spat on their automobile.

Between August 10, 1979 and August 13, telephone lines to the construction site were cut in a manner precluding easy repair. On August 13, 1979 telephone company repair crews refused to fix the cable because of the presence of approximately eight pickets,

1. According to plaintiff's allegations, the Trades Council (1) is an unincorporated association commonly known as a trade union, (2) is composed of one or more classes of members each being a labor organization which represents employees of employers in industries in or affecting interstate commerce for the purposes of collective bargaining within the state of New Jersey, and (3) acts on behalf ·of its members in such activities as the organization for collective bargaining purposes of employees of employers in the construction industry in southern New Jersey, and the approval, organization, support and coordination of strikes and picket lines, on behalf of its members against employers in the construction industry in southern New Jersey.

2. The plaintiff claims that the defendants are aware that if a contractor cannot obtain a source of concrete located near a construction project, the contractor will be unable to complete the project or will incur extraordinary expenses to obtain an adequate supply.

and at least one subcontractor, out of fear for damage to his equipment by the pickets, refused to perform services. The pickets also slashed tires on the automobiles of Altemose employees.

On August 14, 1979 eight union pickets obstructed the entrance of Altemose's project superintendent and later entered the site to communicate threats that the superintendent was "as good as dead." The pickets threatened the driver of a Lentine concrete delivery truck, told the superintendent that there would be no more concrete, and hurled stones at Altemose employees and their vehicles.

On August 15, 1979 and allegedly as a result of the acts of the pickets on the previous day, Lentine informed plaintiff that it would no longer deliver concrete to the job site, but that it would batch and sell to Altemose at no reduction in price, if Altemose arranged its own delivery. Consequently Altemose sought to arrange the same terms with defendants Silvi and Eastern, both of which were located closer to the project site than defendant Lentine. Silvi and Eastern refused to deal with Altemose

> as a result of an *express or implied agreement between each of them and one or more of the union defendants,* or because one or more of the union defendants or persons acting on their behalf threatened or coerced defendants Silvi and Eastern where an object thereof was to force or require Silvi and Eastern to cease and refrain from doing business with Altemose.

Complaint, at ¶ 33 (emphasis added). By virtue of this refusal to deal, Altemose sustained damages to the extent that it was required to use its own vehicles to transport concrete from the Lentine plant to the construction site.

On August 21, 1979 one of the union pickets followed an Altemose truck from the job site to the Lentine plant and later in the day a representative of the teamsters contacted Lentine to discuss Altemose and Tilton. Plaintiff alleges that Robert Cericola, an official of the teamsters, told Len-

tine that if it did not cease dealing with Altemose, another union might refuse to work with concrete supplied by Lentine at an unrelated Ocean City (New Jersey) wastewater treatment plant project. This threat was allegedly repeated on August 23, 1979. Complaint, at ¶ 36.

Additional vandalism occurred that night in the early hours of August 24. A chain link fence was cut on property adjacent to the work area. An Altemose truck was parked there. A window had been broken and gasoline and an undetonated stick of dynamite were found inside the vehicle. Based on a state court hearing in New Jersey, Superior Court Judge Philip A. Gruccio found the defendant Trades Council was responsible for this damage. Complaint, at ¶ 37.

Approximately nine labor union pickets who identified themselves as Roofers were dispatched to the job site on August 30. They threatened to assault workmen, explode the construction office (trailer) and burn the construction site. They also scattered nails in the site entrance and threw excrement into the office. Two pickets were arrested for assaulting a potential subcontractor who attempted to enter the work site and for attempting to assault the project foreman.

During the evening of September 6 or 7, 1979 the office was vandalized extensively. Judge Gruccio found that the Trades Council was also responsible for this action. Complaint, at ¶ 40.

On September 10, 1979, the labor union defendants dispatched four pickets to the Tilton site. On this occasion they threatened Altemose employees, punctured tires on the job superintendent's car and attempted to assault the job foreman. During that evening the office was again vandalized, phone lines were cut and other equipment was damaged. Also during this period phone service was not restored and electric lines were not installed because the employees of the respective utilities were threatened and intimidated by pickets. On September 13 or 14 construction equipment was severely damaged.

The union defendants expanded their efforts to a new battleground on September 20 when they allegedly contacted the general contractor for the wastewater treatment plant in Ocean City and threatened to picket the site if that contractor purchased concrete from Lentine. This action was allegedly taken to pressure Lentine to cease doing business with the plaintiff. Complaint, at ¶ 45. As a result Lentine's representatives met with union representatives on September 24, and on the following day Lentine drastically reduced the amount of concrete it would sell to Altemose. Ultimately no additional concrete was sold to the plaintiff. Altemose alleges that this occurred as a result of an *agreement* between Lentine and the unions or due to coercion imposed by the unions to compel Lentine to cease dealing with Altemose. Complaint, at ¶ 47.

On the evening of September 27, persons that the plaintiff believes acted in concert with the union defendants trespassed on the job site and caused damage to machinery and materials amounting to $2,000. Plaintiff alleges further damage resulting from the picketing and other conspiratorial activity in that it is deprived of necessary materials and services and must make extraordinary expenditures to construct fencing and other protection, and to obtain delivery of concrete. Termination of the contract with Tilton is allegedly becoming increasingly probable and Altemose fears that without judicial intervention it will be wholly excluded from the construction market in southern New Jersey and other ventures by the principals of Tilton.

## II. *Antitrust Analysis*

Altemose claims that the defendants violated the Sherman Act by conspiring to restrain interstate trade,[3] and conspiring and attempting to monopolize[4] the construction market in southern New Jersey, particularly Atlantic County. The labor defendants base their motion to dismiss on statutory and judicially created immunity applied to labor activities in the antitrust context.

### A. *Statutory Immunity*

■ Although certain conduct of labor organizations may fall within the literal proscriptions of the Sherman Act, Congress has authorized immunity for the legitimate self-interested activities of labor organizations.

Section 6 of the Clayton Act, 15 U.S.C. § 17 immunizes the formation of unions from the monopolization offense by its declaration that "[t]he labor of a human being is not a commodity or article of commerce," and therefore cannot be monopolized. This section also provides broad immunity from the restraint of trade offense.[5] Section 20 of the Clayton Act, 29 U.S.C. § 52, identifies the following non-enjoinable lawful conduct:

**3.** 15 U.S.C. § 1. This section provides
[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

**4.** 15 U.S.C. § 2. This section provides
[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and [be subject to the same penalties available under 15 U.S.C. § 1].

**5.** Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor . . . organizations, instituted for the purposes of mutual help, and not having capital stock and conducted for profit, or to forbid or restrain individual members of such organizations from *lawfully* carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws. 15 U.S.C. § 17 (emphasis added).

(1) the termination of a relation of employment, the cessation of work or the recommendation, advice or persuasion of others by *peaceful* means to terminate employment or cease work;

(2) the attendance at any place where such labor disputants are lawfully situated for the purpose of *peacefully* obtaining or communicating information, or from *peacefully* persuading any person to work or abstain from working;

(3) the cessation of patronage or employment of any party to such dispute, or the recommendation, advice, or persuasion directed to others by *peaceful* means to cease patronage or employment; and

(4) the commission of any act that might be lawfully done in the absence of such dispute.

That section also withholds authority to grant injunctive relief in cases between employers and persons seeking employment growing out of terms or conditions of employment unless the plaintiff demonstrates that irreparable injury will occur to a property right.

The Clayton Act was enacted in 1914 and the exemption embodied therein was first applied by the Supreme Court in 1921. In *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921) a nationwide secondary boycott[6] was instituted by a national labor organization to induce the purchasers of a manufactured product shipped in interstate commerce to withdraw their patronage from the producer. The Court held that despite the provisions of the Clayton Act, the secondary boycott was not exempt from Sherman Act proscriptions.

In 1932 the enactment of the Norris-LaGuardia Act[7] adumbrated a less restrictive application of the Sherman Act and direct-

ed the courts to give a broader meaning to the definition of "labor disputes" that were not subject to injunctions of federal courts. "The term 'labor dispute' includes any controversy concerning terms or conditions of employment . . . or seeking to arrange the terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 113(c). Examples of conduct stemming from a labor dispute that may not be enjoined include the following:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment . . . ;

.   .   .   .   .

(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by another method not involving fraud or violence;

(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

(h) Agreeing with other persons to do or not to do any of the acts heretofore specified . . .

29 U.S.C. § 104.

The Norris-LaGuardia Act was construed to provide broad exemption for labor disputes in *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941). *Hutcheson* involved a criminal prosecution against officials of the carpenters union who prompted a strike of carpenters employed by a brewing company and carpenters employed in a construction project for the brewery and its adjoining tenant. The work refusal was precipitated by jurisdictional conflict in which the carpenters' and

**6.** A secondary boycott is a combination with the purpose and effect to coerce customers, patrons or suppliers, through fear of loss or bodily harm, to withhold or withdraw their business relations from an employer who is under attack. *Black's Law Dictionary* 1212 (5th ed. 1979).

**7.** Ch. 90, §§ 1–15, 47 Stat. 70 (1932) (current version at 29 U.S.C. §§ 101–15).

machinists' unions both demanded that certain types of work be awarded to their members. The *Hutcheson* Court discarded the approach formulated in *Apex Hosiery Co. v. Leader, see* note 8 *infra*, that had focused on whether strikes and boycotts were illegal restraints on the product market, and ruled that § 20 of the Clayton Act and the Norris-LaGuardia Act must be read as a harmonizing test that immunized concerted peaceful[8] activity.

Harmonization of the national labor and antitrust policies assumed a modified posture in response to the enactment of the Taft-Hartley Act of 1947. Specifically, the act declared that a secondary boycott is an unfair labor practice when committed by a labor organization. 29 U.S.C. § 158(b)(4).[9]

**8.** In the previous year, the Court had ruled that certain violent activity on behalf of labor organizations did not subject the labor groups to antitrust liability. *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). Some employees of a hosiery factory, together with a large number of non-employees, seized control of the plant, prevented the employer from shipping completed hosiery in interstate commerce and destroyed over $800,000 of machinery. Nonliability of the defendants was based not on statutory immunity, but rather upon the plaintiff's failure to demonstrate the requisite jurisdictional effect on interstate commerce. The Court emphasized that "only when the intent or necessary effect upon such commerce in the article is to enable those preventing the manufacture to monopolize [the] supply or control its price, or discriminate as between its would-be purchasers, that the unlawful interference with its manufacture can be said directly to burden interstate commerce." *Id.,* at 510–11, 60 S.Ct. at 1001. In the circumstances of *Apex* the obstruction of transportation of the goods of a single manufacturer was deemed to have an insufficient effect on interstate commerce to invoke the Sherman Act.

Since 1940 the jurisdictional breadth of the Sherman Act has expanded significantly. "[A]ctivities within the flow of interstate commerce or affecting commerce are within the statute's embrace . . . [and] [w]hat may appear to be relatively local will, in fact, ultimately affect similar or related goods or services moving into or out of a market." P. Areeda & D. Turner, *Antitrust Law* ¶¶ 232a, 232b (1978).

This expansive view was recently exemplified in a private antitrust action against real estate brokers and trade associations alleging that the defendants conspired to fix prices through an agreement to conform to a fixed rate of broker's commissions on sales of residential realty. The Court ruled that the plaintiffs need not make the particularized showing of an effect on interstate commerce caused by the alleged conspiracy or other allegedly unlawful acts. Sherman Act jurisdiction could be established, rather, by demonstrating that the defendants' brokerage activity had a substantial effect on interstate commerce. *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980).

Professors Areeda and Turner would presume the existence of Sherman Act jurisdiction even when trade restraints are localized based on their "inherent tendency to affect interstate resource allocation and the interstate movement of goods and services in our national economy." P. Areeda & D. Turner, *supra,* ¶ 232b, at 230.

**9.** The relevant portions of this subsection follow:

(b) It shall be an unfair labor practice for a labor organization or its agents—

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; . . .

Provided further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the

This restrictive labor statute permits the accommodation of national labor and trade regulation policies to shift toward an application that facilitates unfettered business competition.

### B. *Nonstatutory Immunity*

■ A judicially created immunity protects, in limited circumstances, labor organizations and bodies with which the labor units reach agreements. This exemption embodies the congressional policy favoring the collective bargaining process and judicial restraint in labor controversies.[10]

Similar to the statutory exemption, this protection may be invoked only when the labor organization acts in its own self-interest. *Allen Bradley Co. v. Local 3, IBEW*, 325 U.S. 797, 808, 65 S.Ct. 1533, 1539, 89 L.Ed. 1939 (1945); Mann, Powers & Roberts, *supra*, note 10, at 749. Yet, even if a union engages in conduct in its self-interest, the Sherman Act will not permit unions to aid non-labor groups to create business monopolies and to control the marketing of goods and services. *Allen Bradley Co. v. Local 3, IBEW, supra*, 325 U.S., at 808, 65 S.Ct. at 1539.

In *Allen Bradley*, a local union of electrical workers utilized strikes and boycotts to obtain closed-shop agreements with electrical equipment manufacturers and contractors in the metropolitan New York area. The contractors were obligated to purchase equipment solely from local manufacturers having closed-shop agreements with the Local No. 3, while the manufacturers were prohibited from selling to local contractors that did not have closed-shop agreements with the local union. Consequently, the business of New York City manufacturers soared while employment for union members increased and conditions of employment improved. The effectiveness of the

agreements was demonstrated by the lower prices sought by the manufacturers for sales outside the New York City area and the determination of the plaintiff to challenge the restriction that had foreclosed it from the metropolitan New York City market.

In 1965 the Supreme Court decided two challenges to assertions of non-statutory immunity. The exemption did not apply in *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), in which the union and large coal producers executed an industry-wide agreement substantially raising wages and rendering continued operation for the small producers difficult. The Court ruled that a union may not conspire with employers who seek to eliminate competitors from an industry even if the union's part in the scheme is limited to seeking industry-wide uniformity in wages, hours and other working conditions. *Id.*, at 665–66, 85 S.Ct. at 1591. In *Pennington's* companion case, *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), however, the union-employer agreement on food market operating hours was held exempt although no majority supplied the rationale for the decision.

*Connell Construction Co. v. Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975) represents the most recent authoritative treatment of the non-statutory exemption. In *Connell* immunity was withheld from a union that obtained an agreement from a general contractor not to deal with subcontractors that had no collective bargaining agreement with the union. The contract precluded non-union subcontractors from competing for available work on grounds independent of economic efficiency. Writ-

---

labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of

the employer engaged in such distribution;
. . .

**10.** 7 J. Von Kalinowski, Antitrust Laws and Trade Regulations § 48.03 (1979); Mann, Powers & Roberts, *The Accommodation Between Antitrust and Labor Law: The Antitrust Labor Exemption*, 9 Seton Hall L.Rev. 744, 748 (1978).

ing for the Court, Mr. Justice Powell announced that

> [t]his kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions. It contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws.

*Id.*, at 625, 95 S.Ct., at 1836.

### C. *Viability of the Antitrust Allegations*

■ Before the court must consider whether alleged conduct of the defendants is immune from antitrust attack, viable antitrust violations must be pleaded.[11] At paragraph 18 of the complaint Altemose claims that the defendants and co-conspirators engaged in unlawful combinations and conspiracies in unreasonable restraint of interstate trade, 15 U.S.C. § 1, and have unlawfully combined, conspired and attempted to monopolize the construction industry in Atlantic County, New Jersey, 15 U.S.C. § 2.

The allegations in the complaint reveal that Altemose's construction work has been impeded by activities engaged in on behalf of the union defendants. Significant impediments include vandalism at the job site in question, violence and threats of violence directed to Altemose employees and those who would provide services to Altemose, and threats to suppliers of Altemose if the suppliers dealt with the plaintiff. In consequence of the alleged unlawful acts, the plaintiff has sustained substantial difficulty and additional cost in obtaining concrete required to complete the racquetball club as

well as other damages already discussed. These allegations facially disclose an unreasonable restraint of trade under Section 1 of the Sherman Act.

Altemose's claim that the defendants have conspired and attempted to monopolize the construction industry in the relevant market demands additional scrutiny. No defendant is currently engaged as a general contractor in the construction industry, nor has any evidence been presented to the court demonstrating that the defendants seek to expand their fields of business in a manner that will supplant services performed by Altemose.

■ Section 2 of the Sherman Act, however, contains no requirement that the objective of those who conspire or attempt to monopolize must be to eliminate a business concern engaged in the same field as the would-be monopolists. Standing to pursue an antitrust action is broadly granted to "[a] any person who [is] injured in his business or property by reason of anything forbidden in the antitrust laws . . . ." 15 U.S.C. § 15.[12]

■ The plaintiff's allegations are sufficiently well-pleaded to state a cause of action under Section 2 of the Sherman Act. It is, therefore, the obligation of this court to determine whether the acts as alleged are exempt from the reach of the Sherman Act.

Since the authorization of casino gambling in Atlantic City, if not earlier, the southern New Jersey construction market has drawn upon resources from throughout the entire nation. As the growth of the casino industry continues, the demand for non-localized sources of construction exper-

---

11. The moving defendants have not conceded that prima facie antitrust violations have been pleaded, but have argued that regardless of the facial validity of the allegations, they are immune under the circumstances presented.

12. *E. g., Betteroads Asphault Corp. v. Federacion de Camioneros*, 391 F.Supp. 1035 (D.P.R. 1975) (plaintiff asphault manufacturer obtained preliminary injunction under Section 2 against defendant trucking associations restraining defendants from picketing and committing other physical acts in an effort to prevent plaintiff

from using non-member haulers); *see Milwaukee Towne Corp. v. Loew's, Inc.*, 190 F.2d 561 (7th Cir. 1951), *cert. denied*, 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1952) (action by movie theatre operator against distributors of motion pictures that owned, controlled or leased theatres, alleging Section 2 violation due to favored treatment (providing first run movies only to the "related" theatres) leading to monopolization of the first run movie market in the relevant area).

tise will grow. Plaintiff claims that the acts of the defendant unions are deliberately aimed at preventing Altemose from engaging in the southern New Jersey construction market and, therefore, unreasonably restrain interstate commerce.

■ The Clayton and Norris-LaGuardia Acts provide no immunity for the acts alleged in this action. Section 4 of the Clayton Act merely states that labor organizations may lawfully carry out their legitimate objects. Section 20 of the Clayton Act exempts peaceful labor activity including communication aimed at persuading individuals to cease working for or patronizing particular employers. Plaintiff's allegations are replete with acts and threats of violence that were made to prevent Altemose from completing construction of the racquetball facility and to prevent Altemose from obtaining necessary supplies for the construction. Although it was in the interest of the union defendants to seek to remove the nonunion contractor from the job, or to ensure that the terms under which its employees worked met area standards of union members, the objective was not pursued by use of peaceful authorized methods.[13]

■ The defendants cannot find refuge behind the Norris-LaGuardia Act with respect to the plaintiff's damage claims since this law merely limits the availability of injunctive relief. *Los Angeles Meat & Provision Drivers Union, Local 626 v. United States*, 371 U.S. 94, 99–100, 83 S.Ct. 162, 165, 9 L.Ed.2d 150 (1962); *Robertson v. National Basketball Association*, 389 F.Supp. 867, 880 (S.D.N.Y.1975). Altemose has, however, demanded injunctive relief in its complaint, 15 U.S.C. § 26,[14] although no application for a preliminary injunction has

been filed. Pursuant to the Supreme Court mandates requiring that the labor and antitrust statutes be applied harmoniously and in consideration of the plaintiff's allegations, this court would not issue an injunction in contravention of the Norris-LaGuardia Act. The relevant provisions of the Norris-LaGuardia Act, as noted above, prevent the issuance of injunctions forcing individuals to continue an employment relation or preventing publicizing a labor dispute. In contrast, the acts complained of, in essence, were violent, coercive and intended to restrain trade in the construction industry. Any injunction that might subsequently issue from this court would prohibit only those trade restraints that are not otherwise immunized.

■ The moving defendants have also sought to invoke the nonstatutory immunity. As noted, this judicially created immunity protects labor and business organizations from antitrust liability arising from agreements they reach as part of the collective bargaining process. Plaintiff's allegations charge that an agreement was reached between the labor defendants and concrete suppliers outside the context of any collective bargaining agreement. The alleged agreements operated to impose a trade restraint on the plaintiff, a non-labor entity. The facts as pleaded do not permit the invocation of non-statutory immunity as a basis to dismiss the complaint under Rule 12(b)(6).

At this juncture, the court is concerned solely with the allegations of the complaint, not with the facts as they may ultimately be proved. Those allegations, however, have averred facts sufficient to overcome the assertion that the moving defendants, on the face of the complaint, are immune from the present action.

---

13. *See* F. Bartosic & R. Hartley, *Labor Relations Law In The Public Sector* 134–36 (1977) (examples of permissible requests and publicity).

14. 15 U.S.C. § 26 provides in pertinent part as follows:

Any person, firm, corporation or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . . a preliminary injunction may issue . . . .

**1192**

III. *Presentation of Claim for Relief under Section 303 of the Labor-Management Relations Act*

 Section 303 of the Labor-Management Relations Act of 1947, 29 U.S.C. § 187, declares illegal the unfair labor practices defined at 29 U.S.C. § 158(b)(4) and confers jurisdiction on federal district courts to award damages to the parties injured by unfair labor practices. One category of unfair labor practice so proscribed is committed when a labor organization or its agents

> threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is—
>> (A) forcing or requiring any employer or self-employed person . . . to enter into any agreement which is prohibited by subsection (e) of this section.

29 U.S.C. § 158(b)(4)(ii). The above-referenced subsection (e) prohibits certain boycott activities. Specifically this subsection declares that an unfair labor practice is committed when "any labor organization and any employer . . . enter into any contract or agreement, express or implied, whereby such employer . . . agrees to . . . cease doing business with any other person . . . ." 29 U.S.C. § 158(e).

The moving defendants suggest that Altemose's allegations charge that the union defendants may have pressured or requested neutral third parties to avoid dealing with the plaintiff, but that such conduct is not unlawful. Certainly the unions may request neutral employers to cease dealing with Altemose and may publicize their grievances with the plaintiff, but the charges in the complaint clearly claim that the bounds of lawful union activity allegedly have been transgressed.

At paragraphs 33 and 47 of the complaint, Altemose has alleged that the defendants committed unfair labor practices as defined in 29 U.S.C. § 158, subsections (b)(4)(ii) and (e). Paragraph 33 claims that the union defendants threatened or coerced defendants Silvi and Eastern to cease doing business with Altemose while paragraph 47

avers that defendant Lentine entered into an agreement to cease dealing with Altemose as a result of threats and coercion by the union defendants. Accordingly, the defense motion to dismiss for failure to state a claim for relief under § 303 of the Labor-Management Relations Act is denied. Fed. R.Civ.P. 12(b)(6).