William Rolland FRY and Carol F. Glassman derivatively on Behalf of Bally Manufacturing Corporation and representatively on Behalf of themselves and all others similarly situated, Plaintiffs,

v.

Donald J. TRUMP; George A. Aronoff; James R. Cowan; Alfred C. Linkletter; Patrick L. O'Malley; Kenneth C. Nichols; Robert E. Mullane; James A. Lovell; Pierre A. Rinfret; Walter Wechsler and James M. Rochford, Defendants,

and

Bally Manufacturing Corporation, Nominal Defendant.

Civ. No. 87–373 (JFG).

United States District Court, D. New Jersey.

Feb. 2, 1988.

Richard D. Greenfield, Greenfield & Chimicles, Haverford, Pa., and Arthur E. Ballen, Ballen Keiser & Gertel, Camden, N.J., for plaintiffs.

John J. Barry, Clapp & Eisenberg, Newark, N.J., and Harvey D. Myerson, Finley, Kumble, Wagner, Heine, Underber, Manley, Myerson & Casey, New York City, for defendant Donald J. Trump.

Philip R. Sellinger, Sills Beck Cummis Zuckerman Radin Tischman & Epstein, P.A., Newark, N.J., and Samuel Kodet, Skadden, Arps, Swate, Meagher & Flom, New York City, for defendants Bally Directors.

Kenneth D. McPherson, Waters, McPherson & McNeill, P.A., Secaucus, N.J., for defendant Bally Mfg. Corp.

## OPINION

GERRY, Chief Judge.

This is a private derivative and class based action by various shareholders of Bally Manufacturing Company ["Bally"] against the directors of that company and former principal shareholder, Donald J. Trump. Plaintiffs make various allegations including breach of fiduciary duty and waste of corporate assets, illegal payment of "greenmail," breach of fiduciary duty and/or aiding and abetting such a breach by defendant Trump, violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated under that Act, violations of Section 17(a) of the Securities Act of 1933, and violation of Section 14(a) of the 1934 Act. Defendants Trump and Bally directors now move under Federal Rules of Civil Procedure 12(b)(6) for dismissal of plaintiffs' consolidated complaint.

## I. FACTS

It appears that the factual scenario preceding this action can be distilled as follows. Among its other business activities, Bally operates hotels and gambling casinos in Atlantic City, New Jersey and Las Vegas and Reno, Nevada. As of January 22, 1987, Bally had issued 30.9 million outstanding shares of common stock, which is listed and traded on the New York Stock Exchange.

Bally historically had been a manufacturer of various gaming and other types of amusement equipment. Not long after the advent of casino gambling in Atlantic City

in 1977, however, Bally decided to move into the business of casino and hotel ownership as well—both in Atlantic City and Nevada. After its diversification, however, Bally encountered business difficulties resulting in a large indebtedness and a high debt-to-equity ratio.

During the period of November 13, 1986 to December 1, 1986, defendant Trump acquired 9.9% of Bally's outstanding common stock. On November 24, Trump filed a Schedule 13–D with the Securities and Exchange Commission ["SEC"] setting forth his purpose in purchasing this stock. Trump wrote that he had bought the stock "for the purpose of making a significant investment in the company."

At this stage, according to plaintiffs, Bally's directors feared a hostile takeover attempt by Trump. The directors then reacted, plaintiffs allege, by creating various obstacles to a potential takeover try by Trump, primarily for the purpose of keeping themselves in office. These "obstacles" were as follows. On December 4, the Bally defendants adopted a poison pill —a "Preferred Stock Purchase Rights Plan." The pill, triggered by acquisition of 20% of Bally's common stock or a tender offer for 30%, permitted stockholders other than the attempted acquirer to purchase $120 worth of Bally common for $60. Such a pill would force a potential acquirer to pay a very high price in order to control Bally.

On the same date defendant directors announced a "restructuring plan," the implementation of which, plaintiffs charge, would require a sale of valuable Bally assets in light of its high debt-to-equity capitalization ratio. While the above-mentioned plans were in the works but not yet announced or implemented, however, meetings were taking place between Bally and Trump to discuss the possibility of a friendly takeover. Plaintiffs allege that defendant directors took part in these meetings not in good faith, but only to stall for time while they concocted various obstacles to a potential hostile takeover attempt by Trump. Whatever the reason for these meetings, defendant directors filed a suit against Trump soon afterward seeking a declaration that the poison pill was valid under New Jersey Law, and alleging violations by Trump of federal securities and antitrust laws.

Finally, Bally defendants entered into a contract to purchase the Golden Nugget Hotel/Casino in Atlantic City for $439 million. Plaintiffs charge that this is a grossly overvalued price, and that the transaction was entered into only to make Bally a far less attractive takeover target.

On December 16, 1986, Trump filed a counterclaim in the suit brought against him by the Bally directors, asserting various claims against Bally and certain officers and directors of the company and alleging a number of common law claims and violations of federal securities laws. In his counterclaim, Trump contended that his claims were "brought to redress and abate continuing injuries inflicted upon Bally stockholders, in general, and Trump, in particular, by Bally and the Bally defendants in the course of an ongoing scheme to entrench themselves in control of Bally and thereby protect their extraordinary salaries, 'golden parachutes' and other lucrative perquisites." Trump's counterclaim went on to charge that the Bally directors had deliberately sacrificed the interests and financial opportunities of Bally and its stockholders for their own personal gain. Plaintiffs allege that also at this time, Trump denied in pleadings and in the press that he was a "greenmailer."

On December 29, 1986, plaintiff Dixie O'Neill filed a motion to intervene in the above suit, arguing that no party in the Bally–Trump action adequately represented her interests and that Trump did not represent the interests of other Bally shareholders. Trump opposed O'Neill's motion to intervene.

Around this time, Trump also moved in this court to enjoin consummation of the Golden Nugget purchase. The court ultimately denied Trump's application.

Throughout this period, Trump was evidently engaged in negotiations with Bally's Board of Directors in order to resolve the dispute. On February 23, 1987, it was re-

ported that Bally and Trump had reached an agreement (the "Repurchase" or "Greenmail" agreement, depending to which side one talks) which was approved by Bally's Board of Directors on Saturday, February 21. Under the terms of that agreement, Bally paid Trump $62.4 million in full payment for 2.6 million shares of Bally common stock. According to plaintiffs, this price constituted a profit of $31.7 million for Trump, since Bally paid Trump a premium of more than $4 per share (over 20%) for 2.6 million of his shares, plus a guarantee of $33 per share within one year for Trump's remaining 457,000 shares. In return, Trump agreed to drop his legal claims against Bally and enter into a ten year "standstill agreement" not to purchase Bally stock.

It is the repurchase agreement which is at the core of the action now before the court. In their consolidated complaint, plaintiffs derivatively charge the Bally defendants with breach of their duties of care and loyalty to the corporation and waste of corporate assets for the sole or primary purpose of protecting their positions with the company. As examples of this alleged malfeasance, plaintiffs note the poison pill and restructuring plans, filing of the lawsuit against Trump, purchase of the Golden Nugget, and purchase of Trump's Bally stock at prices said to be far in excess of its actual market value. Plaintiffs further allege that this payment to Trump constituted illegal "greenmail."

In addition, plaintiffs contend that Trump, by reason of his substantial holdings of Bally stocks and the position he assumed by asserting (counter) claims on behalf of Bally shareholders, assumed a fiduciary relationship to the company and its shareholders which he breached by accepting the payment for his stock. Furthermore, Trump is alleged to have aided and abetted the wrongful conduct of the director defendants in order to get this illegal payment.

Violations of Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 are also charged, based on a number of public statements Trump made intended (it is claimed) to assure plaintiffs and other Bally shareholders that Trump was looking out for their interests. In a related light, misstatements or omissions of material fact are alleged under Section 17(a) of the Securities Act of 1933.

Plaintiffs also contend that defendant directors failed to describe certain pending legal actions in a proxy statement dated March 24, 1987, as required by Section 14(a) of the 1934 Act.

Two counts couched as class actions, and similar to claims described above, have also been advanced by the plaintiffs. A wide variety of relief is sought.

All defendants now move the court to dismiss plaintiffs' consolidated complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II. LEGAL ANALYSIS

### A. *The Applicable Standard of Review*

The scrutiny employed when deciding a motion to dismiss a complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure is significantly circumscribed. The complaint must be liberally construed in favor of the plaintiffs, and it should not be dismissed unless plaintiffs could prove no set of facts in support of their claim which would entitle them to relief. *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969). All facts pleaded by plaintiffs must be taken as true and all reasonable inferences must be drawn in their favor. *Altemose Construction v. Atlantic etc., et al.*, 493 F.Supp. 1181, 1183 (D.N.J.1980), *citing McKnight v. Southeastern Pennsylvania Transportation Authority*, 583 F.2d 1229, 1235–36 (3d Cir. 1978). Furthermore, the complaint will not be dismissed unless some insuperable bar to relief is apparent on its face. *Id.*

Insofar as our analysis of the claims in plaintiffs' consolidated complaint implicates state law based issues of the law of corporations, Delaware law will be treated as controlling. Claims involving the "internal affairs" of corporations, such as breach

of fiduciary duty and the like, are subject to the laws of the state of incorporation. *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1527 (9th Cir.1985), *see also, First National City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 621, 103 S.Ct. 2591, 2597, 77 L.Ed.2d 46 (1983). Defendant Bally is a Delaware corporation. (Complaint, ¶ 2g).

### B. *Claims against Defendant Donald J. Trump*

#### 1. Count III: Breach of Fiduciary Duty and Aiding and Abetting Breach

For the sake of convenience, we will deal with moving defendants' arguments in order of presentation in their papers, starting with those filed by defendant Trump.

In Count III of their consolidated complaint, plaintiffs charge Trump with breaching his alleged fiduciary duty to Bally and its shareholders by accepting "greenmail," which constituted a waste of corporate assets. Trump is further charged with aiding and abetting the wrongful conduct of the Bally defendants in order to gain a profit of over $30 million from the " 'greenmail' transaction."

■ In addressing the sufficiency of the allegations of breach of fiduciary duty, we must first pass on the question of whether Trump can have a fiduciary duty imposed upon him under the law. "Generally, a shareholder who owns less than 50% of a corporation's outstanding stock does not, without more, become a controlling shareholder of that corporation, with a concomitant fiduciary status." *Gilbert v. El Paso*, 490 A.2d 1050, 1055 (Del.Ch.1984). Plaintiffs' complaint never alleges that Trump owned more than 9.9% of Bally's outstanding stock. (Complaint, ¶ 32, 53). For Trump to be considered a controlling shareholder for the purposes of a fiduciary relationship, without ownership of a numerical majority of Bally's stock, he must exercise domination over the corporation "through actual exercise of direction over corporate conduct." *Id., citing Kaplan v. Centex*, 284 A.2d 119 (Del.Ch.1971). "Control" or "domination" imply at a minimum "a direction of corporate conduct in such a way as to comport with the wishes or interests of the [person] doing the controlling." *Kaplan*, 284 A.2d at 123. Plaintiffs allege no facts, however, which could support claims that Trump directed Bally's day-to-day conduct in accordance with his wishes. Lacking such allegations, a claim does not exist for breach of fiduciary duty based on Trump's status as a controlling shareholder.

Plaintiffs advance another argument in their brief in an attempt to save their fiduciary duty claim under Count III. They argue that when Trump brought counterclaims against the Bally directors in response to their suit against him, he was in essence bringing a derivative suit on behalf of the corporation against its directors. In such a capacity, plaintiffs argue, Trump assumed a fiduciary position on behalf of Bally's other shareholders. (Plaintiffs' Brief at 27–31). Without passing on the substantive merit of plaintiffs' argument, we must reject its applicability to plaintiffs' defense to this Rule 12(b)(6) motion. Plaintiffs have alleged no facts in their complaint which would support an allegation that Trump's counterclaims in the matter of *Bally Manufacturing v. Trump, et al.*, Civil No. 86–4764, were brought derivatively on behalf of all Bally shareholders. The closest plaintiffs come to so doing is in ¶ 86 of their complaint concerning a different count, where they state that Trump made public statements intended to instill in Bally shareholders "a belief that he was looking out for their welfare[.]" Such language, even when accepted as true, does not rise to the level of a claim that Trump's counterclaims were derivatively brought. Plaintiffs other conclusory statements to this effect are similarly lacking. (*See, e.g.*, Complaint, ¶ 58). Failing to show that Trump's claims were derivative ones, plaintiffs' complaint states no allegation that Trump had a fiduciary duty to Bally's other shareholders.

■ In the second part of Count III, plaintiffs allege that Trump aided and abetted the wrongful conduct of the director defendants. (Complaint, ¶ 82). To set forth a true claim for aiding and abetting a

breach of fiduciary duty, plaintiffs must allege three things: (1) the existence of a fiduciary relationship, (2) breach of fiduciary duty, and (3) knowing participation in that breach by the defendant. *Penn Mart Realty v. Becker*, 298 A.2d 349, 351 (Del. Ch.1972). Plaintiffs clearly have met the first prong of this test, as the directors of a corporation stand in a fiduciary relationship to the corporation's shareholders. *Id.* As for the second prong, we find that plaintiffs have here alleged sufficient facts to state a claim that the Bally directors breached their fiduciary duty to the corporation by paying defendant Trump a premium to buy back his shares of Bally stock. It is true, of course, that a Delaware corporation has the power to deal in its own stock, and that it "may acquire a dissident's shares provided the transaction is free from fraud or unfairness." *Polk v. Good*, 507 A.2d 531, 536 (Del.Supr.1986). There is, however, at least one restriction placed upon such selective stock repurchases—the directors may not have acted solely or primarily out of a desire to perpetuate themselves in office. *Unocal Corp. v. Mesa Petroleum*, 493 A.2d 946, 955 (Del. Supr.1985), *Polk*, 507 A.2d at 536. Plaintiffs have certainly alleged such a motive behind the Bally defendants' repurchase of Trump's stock. (Complaint, ¶ 33, 58). Plaintiffs back this assertion by alleging the following facts: In return for the repurchase, Trump agreed to drop his lawsuit against the Bally directors and entered into a standstill agreement "whereby he agreed not to purchase any voting securities in Bally or seek to influence the company's management or policies for a period of ten years thereafter." (Complaint, ¶ 56). Such an agreement supports a claim that the defendant directors' motive was one of entrenchment. Furthermore, in light of the directors' inherent conflict of interest, cases such as *Unocal*, 493 A.2d at 955, hold that directors must show that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed because of another person's stock ownership when they buy back that person's stock at a premium. Taking all of these factors together, we find that plain-

tiffs here have alleged sufficient facts to state a claim for a breach of the directors' duty through repurchase of Trump's stock. Inquiring any more deeply into plaintiffs' claims would be inappropriate at this stage.

Finally, plaintiffs must set out a claim that Trump knowingly participated in the above-alleged breach of fiduciary duty. Since Trump's state of mind is necessarily implicated in such a claim, painstaking specificity in pleading cannot be realistically expected. We find that plaintiffs' descriptions of the repurchase agreement between Trump and the Bally directors, especially the standstill agreement, suffice to establish a claim that Trump participated in the directors' attempts to entrench themselves. Having met the three prongs delineated in *Penn Mart, supra*, plaintiffs have stated a claim of aiding and abetting strong enough to withstand a motion to dismiss under Rule 12(b)(6).

The third count of plaintiffs' complaint will be dismissed insofar as it alleges a breach of fiduciary duty by defendant Trump, but will remain intact as to charges of Trump's aiding and abetting the Bally directors' breach of fiduciary duty.

### 2. Count IV: Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5

In Count IV, plaintiffs bring claims against the individual defendants pursuant to Section 10(b) of the Securities Exchange Act of 1934 ["the 1934 Act"], 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated under that Act. 17 C.F.R. 240.10b–5. Section 10(b) provides that

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or

appropriate in the public interest or for the protection of investors.

Rule 10b–5 elaborates on this prohibition as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale or any security.

While Count IV is hardly a model of pleading clarity, plaintiffs seem to allege that defendant Trump made several misleading public statements indicating that Trump was not a "greenmailer" and that he was looking out for the welfare of all the Bally shareholders. Despite these assurances, plaintiffs contend, Trump entered into negotiations with the defendant directors which culminated in the execution of the repurchase agreement. These negotiations were not revealed to the public, and that, according to plaintiffs, violates the 1934 Act.

 In the first instance, it is axiomatic that scienter is required for a violation of Section 10(b) and for Rule 10b–5. Scienter can be proved "by a showing that [a defendant] issued false or misleading public statements with knowledge that those statements were false or misleading, or with reckless disregard as to their false or misleading character." *Levinson v. Basic, Inc.*, 786 F.2d 741, 749 (6th Cir.1986), *cert. granted,* —— U.S. ——, 107 S.Ct. 1284, 94 L.Ed.2d 142 (1987). In addition, there may well exist a duty to update such statements if they become "materially misleading in light of subsequent events." *Greenfield v.*

*Heublein, Inc.*, 742 F.2d 751, 758 (3d Cir. 1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985). In essence, then, plaintiffs appear to charge that Trump was under a duty to reveal the fact that negotiations were going on regarding the repurchase agreement.

Two possible legal theories can emerge from such an allegation. One would be that Trump had a duty to disclose these negotiations without more. It is highly uncertain under federal securities law whether such a duty exists. It is quite clear, at least in this Circuit, that preliminary negotiations need not be revealed in the context of a merger. *Id.* at 756. A merger, however, is not implicated in this action, and the big issue is if the same rationales which powered the court's decision in *Greenfield* exist in a case involving negotiations to repurchase stock. A very recent case out of the Second Circuit appears to limit the rationale for the rule articulated in *Greenfield* to merger negotiations. *Kronfeld v. Trans–World Airlines*, 832 F.2d 726 (2d Cir.1987). While the applicability of *Kronfeld* both in this Circuit and to this matter is not crystal clear, we find that its existence adds enough to the balance to tip the decision on whether plaintiffs have alleged a duty by Trump to disclose the aforementioned negotiations in their favor.

The other possible legal theory flowing out of plaintiffs' allegations in this count would be that Trump made various public statements early on in the affair denying that he was a "greenmailer" and implying or stating outright that he was looking out for the other shareholders' welfare. Even if these statements were not misleading when made, the theory goes, they became misleading once Trump entered into repurchase negotiations, and at that point he had a duty to reveal that fact.

We again recognize that it is difficult to specifically allege the element of scienter within the constraints of a complaint and not be too conclusory. In their complaint, however, plaintiffs at least allege facts which would support the desire of Trump to withhold such information from the oth-

er shareholders. Plaintiffs contend, for example, that the repurchase agreement "was devoid of any benefit to the Company and, would indeed cause a very serious financial loss to Bally and its shareholders," (Complaint, ¶ 87(b)), and that the agreement "would cause an unjustifiable increase in Bally's preference obligations, resulting in the present and prospective impairment of its credit rating and its ability to obtain credit," (Complaint, ¶ 87(c)), and that "the Company would suffer an extreme loss of opportunity as a result of the financial limitations placed upon its ability to engage in future beneficial business transactions." Complaint, ¶ 87(d). These allegations, if true, would explain why Trump would want to keep the repurchase negotiations quiet, and we feel that a claim of scienter can be inferred from these allegations for the purpose of surviving a motion to dismiss.

Since we are in the midst of discussing Count IV, we will also now pass on the 1934 Act allegations plaintiffs raise against the Bally defendants. These claims are similar to the ones plaintiffs bring against defendant Trump, and have been more or less set out above. Plaintiffs have not alleged, however, that the Bally directors made any misleading statements in contravention of Rule 10b–5. Instead, plaintiffs contend that (1) the directors had a duty to disseminate accurate information "with respect to the true purpose of the 'greenmail' and 'standstill' agreements and their damaging effects upon Bally and its shareholders" (Complaint, ¶ 95), and that (2) the Bally defendants aided and abetted Trump's violation of Section 10(b) and Rule 10b–5. (Complaint, ¶ 93).

Defendant directors argue for dismissal of this count against them, contending that at most, plaintiffs allege actions by the director defendants constituting no more than corporate mismanagement, and that such claims are not properly brought under the 1934 Act. *Santa Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). But plaintiffs really allege more than that. If proved, plaintiffs' theory would encompass an attempt to manipulate the price of Bally stock by not disclosing negotiations the end result of which could clearly result in a drop in the value of the company's stock. Price manipulation amounts to more than an allegation of corporate mismanagement, and is clearly covered by Section 10(b) and Rule 10b–5.

Plaintiffs' claims here, however, need more than that to survive. Recognizing this, plaintiffs argue that defendant directors had a duty to disclose the substance and status of their negotiations with Trump prior to reaching an agreement to purchase his Bally shares. We have already found that such a claim is strong enough to overcome a 12(b)(6) motion in light of *Kronfeld, supra,* in relation to defendant Trump, and we see no reason to hold otherwise regarding the Bally directors.

As for aiding and abetting, we think enough is pled in the complaint to sustain this claim as well. To establish such a claim, "the person who is primarily liable must have violated a securities law, and the alleged aider and abettor must have known of this violation and by his conduct substantially assisted the primary violation in carrying out the unlawful scheme." *Rochez Brothers v. Rhoades*, 527 F.2d 880, 886 (3d Cir.1975). If Trump's alleged violation, as charged, has to do with keeping his negotiations secret, then the Bally defendants—the individuals with whom Trump was negotiating—certainly knew this was happening.

In sum, we find Count IV sufficiently pled to survive a Rule 12(b)(6) motion to dismiss.

3. Count V: Violation of Section 17(a) of the Securities Act of 1933

Plaintiffs in Count V contend that all the defendants "willfully, recklessly and/or negligently made misstatements or omissions of material facts" in violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77(q)(a). We have held in the past, however, that Section 17(a) provides plaintiffs in securities litigation no private right of action. *Sheftelman v. N.L. Industries, Inc.*, [1984–1985 Transfer Binder]

Fed.Sec.L.Rep. (CCH) ¶ 92,040 (D.N.J. 1985). We see no reason now to reverse ourselves, and decline plaintiffs' invitation to hold off deciding this issue until the time of trial. Count V will accordingly be dismissed for failure to state a claim as to all defendants.

### 4. Class Claims in Counts VII and VIII

Count VII in essence realleges the 1934 Act charges set out in Count IV, discussed above, but in a class action context. Count VIII does the same for the 1933 Act charges in Count V. Without passing on the certifiability of the class, and in light of our analysis of plaintiffs' Section 10(b) and Rule 10b–5 allegations, we find that Count VII sufficiently states a claim under Rule 12(b)(6). In the same light, we find that Count VIII fails to do so. The latter count will be dismissed.

### C. *Claims Against the Bally Director Defendants*

### 1. Count I: Breach of Fiduciary Duty and Waste of Corporate Assets

Defendant directors do not challenge the sufficiency of plaintiffs' pleading in Count I of the complaint, and this count will be allowed to stand. We note, however, that in light of our discussion of Count III, Count I is pled sufficiently well to survive a 12(b)(6) motion.

### 2. Count II: Illegal "Greenmail" Transaction

■ Defendant directors similarly do not challenge the sufficiency of Count II's allegations that the repurchase agreement should be rescinded because it constitutes an illegal "greenmail" payment. Count II brings a derivative claim against the director defendants only, but it is defendant Trump who challenges the sufficiency of the pleading. Since rescission of the repurchase agreement would directly affect Trump, we feel that his challenge to Count II is not inappropriate. Unfortunately for him, however, it must fail. Trump himself concedes that rescission on behalf of a corporation is generally available when a defendant has breached a fiduciary duty owed to the corporation. (Defendant Trump's Memorandum at 43). As we have observed, director defendants do not argue that plaintiffs have failed to sufficiently allege breach of fiduciary duty by the directors in entering into the repurchase (or "greenmail") agreement. Furthermore, we have just noted that such an allegation is sufficiently pled. (Count I). In light of the above, enough is pled under Count II to enable plaintiffs to ask the court to rescind that agreement. Count II will be allowed to stand.

### 3. Count VI: Violation of Section 14(a) of the 1934 Act

■ In Count VI, the last count we need to consider, plaintiffs allege that a March 24, 1987 proxy statement and notice of annual stockholder meeting issued by the director defendants described only eight of 18 pending lawsuits that had been filed against Bally as well as its directors for breaches of their fiduciary duties. (Complaint, ¶ 110). Plaintiffs contend that this omission violates Section 14(a) of the 1934 Act. 15 U.S.C. § 78n(a).

Section 14(a) provides that it shall be unlawful for any person to solicit any proxy in contravention of the rules of the SEC in respect to any registered security. The purpose of this section "is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). In that light, SEC regulation Section 240:14a–9 states that no solicitation by means of proxy or notice of meeting shall be made

containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

Plaintiffs state that the aforementioned proxy statement sought a vote, *inter alia,* on an amendment of Bally's Restated Certificate of Incorporation. That amendment, plaintiffs say, "protects directors from personal liability for negligence in the performance of their duties, including gross negligence." According to plaintiffs, this indemnification extended retroactively with respect to lawsuits currently pending against the directors. (Complaint, ¶ 64). Plaintiffs then list ten cases which they allege the defendant directors did not include in the proxy statement mailed out on March 24.

Accepting the above as true, as we must, it seems evident that plaintiffs have stated a claim under Section 14(a). If, as plaintiffs allege, the proposed amendment affected the directors' liability retroactively, then knowledge of most if not all of the lawsuits presently filed against the directors would appear material enough to require mention in the proxy statement. An omitted fact under Rule 14a–9 is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, et al. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). We feel plaintiffs' pleading passes this standard for Rule 12(b)(6) purposes. Count VI will be allowed to stand.

### 4. Conclusion

In summary, Counts V and VIII will be dismissed as insufficient under Federal Rule of Civil Procedure 12(b)(6). Count III will be dismissed insofar as it attempts to allege a breach of fiduciary duty by defendant Trump, but the remainder of that count will be allowed to stand. Defendants' motions to dismiss Counts II, IV, VI, and VII under Rule 12(b)(6) will be denied. Count I will also be allowed to stand.

An appropriate order has been entered.